The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the alleged contraction of an occupational disease, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff from October 11, 1982 through May 29, 1987.
3. Unigard Indemnity Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage was $201.31.
5. Plaintiff is claiming compensation beginning September 21, 1991.
In addition, the parties stipulated into evidence the following:
1. Deposition of Dr. Treadwell taken regarding the previous hearing.
2. Deposition of Dr. Hamilton taken regarding the previous hearing.
3. Deposition of Dr. Brader taken regarding the previous hearing.
4. Plaintiff's Exhibits 1 and 2 which are photographs from the previous hearing.
5. Transcript of a recorded statement taken September 23, 1993.
6. Letter from J. Morgan Design Associates dated February 12, 1996 with an attachment.
7. A packet of medical records and reports attached to defendants' March 14, 1997 contentions.
In addition, the parties submitted a stipulation that all documents from the Industrial Commission's file and approved or accepted by the Commission will be entered into evidence. However, in view of the voluminous file and the fact that most of the documents in the file would not be relevant to a decision in the case, this stipulation is accepted only insofar as it refers to Industrial Commission forms.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff is thirty-two years old and is a high school graduate. In October 1982 he began working for defendant-employer, a company which packaged and delivered milk products and ice cream. During his first month of employment, he worked in ice cream production, but he was then transferred to a position where he pulled products specified on order sheets. He worked in this latter capacity until he quit on May 29, 1987.
2. Plaintiff's job duties involved getting an order form which had been completed by one of the drivers for a customer, finding the ice cream products listed and stacking them on a cart for the driver to pick up for his next delivery. Once that order was completed, he would then pull the items on the next order. While pulling the orders, he worked in a freezer room which was from minus five to minus twenty degrees Fahrenheit. The company provided an insulated suit, boots, gloves and a hood for him to wear while working in the freezer room. There were no set break times and plaintiff might work for a couple of hours in the freezer room before leaving to warm up. When the truck drivers returned to the plant for their next orders, plaintiff would take their carts to a foyer area where the temperature would be between forty and fifty degrees Fahrenheit.
3. During an eight hour shift, plaintiff worked in the freezer room from four to six hours, depending upon the season. There was much more demand for ice cream during the summer months than in the winter and he would spend more time in the cold when demand was high. In addition, there were times when the company was understaffed and he would have to work longer.
4. Beginning in approximately 1984, plaintiff began to notice stiffness in his joints which he attributed to getting older and to working in the freezer. He did not seek medical attention for his symptoms until after he quit working for the dairy in May 1987. On August 11, 1987 he went to Dr. Patrone, a rheumatologist, and described his ongoing problems with joint stiffness and with feeling exhausted all of the time. His worst pain was in his shoulders, his low back, his knees and sometimes his ankles. However, at that visit he did not mention problems with his hands and feet, so, even though he described his job duties for defendant-employer, Dr. Patrone did not find indications of Raynaud's disease or Raynaud's phenomenon which would be evident by numbness, coldness and discoloration of the fingers and hands. At that first examination, Dr. Patrone was of the impression that he had fibrositis. However, at the follow-up visit of August 28, plaintiff related that he felt cold all of the time, so the doctor began to consider Raynaud's disease or Raynaud's phenomenon as a possible problem. The condition was ultimately diagnosed in December 1987 and plaintiff was given medication to take for it.
5. Dr. Patrone continued to follow plaintiff until August 23, 1988. He was never able to find anything seriously wrong and by June 1988 indicated that there was no evidence of residue of Raynaud's phenomenon. However, plaintiff described persistent problems which he said affected his ability to perform his job as an electrician's assistant.
6. Plaintiff was then evaluated at Duke Medical Center and was referred to the Rheumatology Clinic there. His condition was diagnosed as fibromyalgia and by April 1989 there was concern that he had possible myopathy. However, an EMG showed no evidence of that condition. After that time, plaintiff did not return for further evaluation. His only treatment during the next couple of years was from Dr. Galloway, his family doctor, whom he saw in September 1990 for diffuse myalgias and joint pains and in April 1991 for back and hip pain.
7. Plaintiff worked as an electrician's assistant from June 1987 until September 25, 1991 when he was involved in a motor vehicle accident where he was apparently rear-ended. Following the accident, he was treated for low back pain and neck spasms in the emergency room and then by a Dr. Dawson. In February 1992 he was referred to Dr. Hamilton, an orthopedic surgeon, for evaluation of his persistent low back symptoms. Dr. Hamilton treated him for that problem for a few months and discharged him from care. On November 20, 1992 plaintiff returned to the doctor with a long hand written statement describing his prolonged history of symptoms of joint pain, achiness and sensitivity to cold. Dr. Hamilton concluded that he had more problems than just the back pain and diagnosed him with fibromyalgia and depression in addition to the Raynaud's phenomenon which had previously been diagnosed. He was given a prescription for Elavil.
8. Even though Dr. Hamilton was not a rheumatologist and did not ordinarily treat the problems plaintiff had, he agreed to see plaintiff until August 1993 because of plaintiff's lack of insurance coverage. However, he subsequently referred plaintiff to Dr. Treadwell, a rheumatologist, whose first examination was on February 4, 1994. Numerous studies were then performed without specific findings, but a subsequent test performed after plaintiff had exercised revealed abnormalities relating to his muscles. Consequently, Dr. Treadwell diagnosed plaintiff with undefined myopathy, fibromyalgia/fibrositis and Raynaud's phenomenon. The myopathy involved breakdown of the muscles by enzymes when the muscles were overexerted. The fibrositis was manifested by muscle aching and pain and problems sleeping. The Raynaud's phenomenon was considered to be symptoms from exposure to cold temperatures associated with his other conditions and not a separate disease entity.
9. Dr. Treadwell provided symptomatic treatment and advised plaintiff to avoid overexerting himself and cold temperatures. He subsequently referred plaintiff to Dr. Wortmann for another opinion and Dr. Wortmann found an emergency room note where plaintiff had red discoloration of his urine. Consequently, another test was performed which indicated that plaintiff had rhabdomyolysis, a condition involving the breakdown of muscle tissue. However, the muscle problems appeared to be related to exertion since his test results were within normal limits when he had not been exercising.
10. Plaintiff continued to see Dr. Treadwell up until the time the doctor's deposition was taken. He was expected to require ongoing medical treatment for the remainder of his life for his multiple medical conditions.
11. Plaintiff testified that he was first advised that his condition might be work related in August 1987 when he first saw Dr. Patrone. However, Dr. Patrone did not know what his problem was at that first evaluation. It was four months later that the doctor decided that he probably had Raynaud's phenomenon, and, in a letter dated March 29, 1988, Dr. Patrone indicated only a possible connection between plaintiff's illness and his exposure to cold at work. Consequently, Dr. Patrone could not have told plaintiff that his condition was likely related to his work. Rather, it appears that plaintiff was so convinced of the causal relationship in his own mind he believed that the doctor must have told him of such a relationship.
12. In fact, no doctor who treated plaintiff during the next few years determined an etiology for his condition. It was Dr. Hamilton who advised him in 1992 or 1993 that, in the doctor's opinion, his problems were secondary to prolonged work in a cold environment. Plaintiff filed a Form 18 with the Industrial Commission in September 1989 so his claim for compensation was filed before he was actually advised by competent medical authority that his condition could be work related. (Although Dr. Hamilton acknowledged that as an orthopedic surgeon he was not an expert in this area of medicine and he deferred to the rheumatologists, he was a duly qualified medical doctor and would therefore be competent medical authority.)
13. Plaintiff was clearly symptomatic during his employment with defendant-employer. Working in the cold of the freezer room precipitated symptoms of pain and numbness in his hands and achiness of his joints and muscles. It took various doctors years to sort out his problem, but he was ultimately diagnosed with myopathy with rhabdomyolysis related to exertion, fibromyalgia/fibrositis and Raynaud's phenomenon. These diagnoses are accepted as fact. His primary difficulties have stemmed from his fibromyalgia, but he has developed muscle pain with exertion and pain and numbness of his hands with exposure to cold.
14. Plaintiff was not proven by the greater weight of the evidence to have been placed at increased risk of developing fibromyalgia/fibrositis or myopathy with rhabdomyolysis by reason of his exposure to cold in his employment with defendant-employer as compared to the general public not so employed. No etiology for these conditions was established by the evidence. Since the symptoms manifested during the time of his employment, plaintiff assumed that his illness was caused by his work exposure to extremely cold temperatures. However, these conditions apparently pre-existed his employment or developed independently of it and the exposure to cold at work merely precipitated symptoms from the underlying illness without significantly contributing to its development.
15. The symptoms of Raynaud's phenomenon plaintiff has experienced are secondary to his other conditions and are not the result of a separate disease process. He was not placed at an increased risk of developing the symptom complex by reason of his exposure to cold temperatures in his employment with defendant-employer as compared to the general public not so employed. Rather, these were some of the symptoms which were precipitated by the work exposure. By definition, a patient with Raynaud's phenomenon would develop constriction of the small blood vessels in the fingers and hands upon exposure to cold temperatures, and the vasoconstriction would cause pain and numbness. As indicated before, the exposure to cold at work, although certainly extreme, was not proven to have significantly contributed to the development of the conditions with which plaintiff was diagnosed.
16. Plaintiff has not proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. This claim was filed on a timely basis since plaintiff was not advised by competent medical authority of a likely work related nature of the condition until after his Form 18 was filed with the Industrial Commission. G.S. § 97-58.
2. Plaintiff has not proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. G.S. § 97-53(13); Booker v. Duke Medical Center,297 N.C. 458 (1979). Wilkins v. J.P. Stevens Co.,333 N.C. 449 (1993).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. This claim must, under the law, be and it is hereby denied.
2. Each side shall pay its own costs.
This the ___ day of March 1998.
 S/ ______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
S/ ______________ THOMAS J. BOLCH COMMISSIONER
DCS:bjp